FILED & ENTERED

MAR 06 2013

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY gonzalez DEPUTY CLERK

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SAN FERNANDO VALLEY DIVISION**

In re:

California TD Investments LLC
Golden State TD Investments, LLC

Debtor(s).

Golden State TD Investments, LLC,  QHL
Holdings, Fund Ten, LLC, Marc Sobel,
Ruth Ann Wundermann-Cooper

Plaintiff(s),

v.

Andrews Kurth LLP, Jon L. Dalberg,
Michael D. Jewesson

Defendant(s).

Case No.:  1:07-bk-13003-GM

Adv No:   1:09-ap-01405-GM

Chapter 11

**REDACTED MEMORANDUM OF OPINION
REGARDING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT
[DOCKET NUMBER 62]**

Date: February 26, 2013
Time: 10:00 a.m.
Courtroom: 303

Defendants Andrews Kurth LLP, Michael D. Jewesson & Jon L. Dalberg

("Defendants") bring this motion for summary judgment ("MSJ") on grounds of i*n pari

delicto.*

**Background**

Although the parties have a filed a significant amount of paper disputing what are

"uncontroverted facts", most of  the essential factual background for this motion is not in

dispute:

Quality Home Loans, Inc. ("QHL") was formed in 2001 by John and Kitty Gaiser (the Gaisers"), who each owned 50% of QHL.  Its business was originating, servicing, buying and selling sub-prime mortgages.

To fund its business, QHL formed the plaintiffs in this adversary proceeding, QHL Holdings, Fund Ten, LLC ("Fund Ten") and Golden State T.D. Investments, LLC ("Golden State" and, with Fund Ten, the "Funds").  QHL was the initial Member and initial Manager of each Fund.  *See* Amended and Restated Operating Agreement of Fund Ten dated 5/3/05  and Amended and Restated Operating Agreement of Golden State dated 3/31/05 (the "Operating Agreements"), which are Defendants' Exhibits A & B and Plaintiffs'' Exhibits 1 & 2, at ¶¶ 3.1, 5.1.[1]  Additional members could be added at a price of $1000 per share.  Id. at ¶ 3.2.  There were approximately $37 million worth of additional memberships purchased in Fund Ten and $20 million in Golden State.  The Gaisers ultimately held less than 20% of the member shares in either Fund.  Declaration of Randy Miller in Support of Plaintiff's Opposition to MSJ at ¶ 7.

The Funds' stated purposes were "to acquire, hold and liquidate promissory notes secured by deeds of trust and mortgages to real property in the United States of America, and to distribute to the Members the Available Cash therefrom."  Operating Agreements ¶ 2.4 (the "liquidate" purpose was only in Golden State's Operating Agreement.)

The Funds had no employees and were managed by QHL (which remained the only manager of each Fund through the events described herein) under the terms of Operating Agreements.  The Operating Agreements gave QHL, as manager, authority to "manage and direct" the Funds (¶ 5.3), but required approval of a majority of member

---

[1] Defendants' Exhibits are attached to the Declaration of Joshua Jessen in support of the MSJ.  Plaintiffs' Exhibits are attached  to the Declaration of Dennis DeFranzo in support of Opposition.

shares before the manager could act with respect to:

(a)    the sale, lease, exchange, mortgage, pledge or other disposition of all or substantially all of the Company's assets;

(b)    the Company's merger with or conversion into another entity;

(c)    [undertaking involving a debt or obligation which would, when taken with all other obligations of the Company, exceed one half of the face value of all notes held by the Company]; and

(d)    a transaction, not expressly permitted by this Agreement, involving a conflict of interest between the Manager and the Company, provided however that the sale to the company of mortgage loans originated by the Manager shall not be deemed a conflict of interest.

Operating Agreements ¶5.4 (provision C in brackets is only in Fund Ten's Operating Agreement].

In May and June of 2007 QHL and the Funds entered into three separate transactions: one with Silar Advisors, L.P., one with Pacificor, LLC and one with Bayview Financial, LP (the "Transactions").  Andrews Kurth was special counsel to QHL and the Funds (as well as another related entity) in the Transactions and issued opinions that were conditions to closing in each Transaction.

The particulars of these Transactions are not clear from the papers and the harm to the Funds arising from these transactions is a disputed fact that is the crux of this MSJ.  Plaintiffs have presented some evidence that the Transactions sold, pledged or otherwise put the assets of the Funds at risk, in transactions that benefitted QHL, but not the Funds.  In early 2007, QHL was experiencing cash flow difficulties and was trying to "shore up" with the Silar Transaction and possibly the Pacificor transaction.

Miller Dec. at ¶ 9; 5/17/07 e-mail of Michael Jewesson, which is Plaintiffs' Exhibit 10.

The Funds were not experiencing cash flow difficulties, at least through March 2009.

Miller Dec. at ¶ 9. The Pacificor Transaction gave Pacificor the right to pursue remedies

against QHL and the Funds upon default by any of them.  See Draft Repurchase

Agreement with accompanying e-mails, which is Plaintiff's Exhibit 7; Notice of Motion

and Motion of  Pacificor, LLC for Order Confirming Applicability of 11 U.S.C. § 555 (filed

11/21/07 in Case No. 07:13003-GM), which is Plaintiff's Exhibit 8, at 1-3.   The UCC

Financing Statements annexed to the Andrews Kurth opinion respecting the Pacificor

Transaction lists QHL collateral of $401,949.35, Golden State collateral of

$20,420,214.67 and Fund Ten collateral of $12,164,385.93.  Plaintiffs' Exhibit 5.   In

November of 2007, Pacificor sought permission to exercise its remedies against the

Funds.  Pacificor § 555 Motion (Plaintiffs' Exhibit 8).   The Funds and QHL received

over $45 million from the Pacificor Transaction.  Id.  Under the Funds' Operating

Agreements, QHL, not the Funds, received all earnings over the 12% annual

distributions made to Fund members.  Operating Agreements at ¶¶ 4.4(a) & 5.7; Miller

Dec. at ¶ 8.  Thus, any increased cash flows from these transactions would accrue to

the benefit of QHL, while the Funds subjected their assets to risk.

On 8/21/07 QHL and the Funds filed for chapter 11 relief.

On 8/14/09, the Funds commenced an action against the Defendants in Los

Angeles Superior Court (#BC419791), which was removed to this court and became

this adversary proceeding.  In this proceeding, Plaintiffs allege that the Transactions

damaged the Funds and would not have occurred without the opinion of Andrews Kurth.

(The individually named defendants are Andrews Kurth attorneys who worked on the

Pacificor transaction.)  Plaintiffs assert claims against the Defendants for malpractice

and breach of fiduciary duty.  In essence, their claims allege (i) Andrews Kurth had a

conflict of interest representing both QHL and the Funds and (ii) the Andrews Kurth

opinion did not accurately reflect the terms of the Operating Agreements.

[REDACTED] The Bonds indemnified the Funds for, among other things, "Loss

resulting solely and directly from one or more dishonest or fraudulent acts by an

employee . . . ."  Complaint dated 4/15/10 commencing the Bond Action ¶ 9

(Defendants' Exhibit F).


## The Motion and its Responses

Motion

Defendants have brought this MSJ on grounds of *in pari delicto:* that the Funds

engaged in misconduct directly related to Defendants' alleged wrongdoing.  In essence,

they argue that the Funds admit to QHL's wrongdoing and QHL's misconduct should be

imputed to the Funds (i) under principles of corporation and agency law and (ii) as a

matter of judicial estoppel.

Defendants first allege *that the Funds have admitted* a laundry list of wrongdoing

by Gaiser and QHL including falsifying documents, having the Funds make investments

in worthless assets and assets that were not authorized under the Funds' Operating

Agreements, theft of money from the Funds by QHL and amendment of the Funds'

operating documents without the requisite member consent.  The three 2007

Transactions were merely a continuation of this same fraudulent and dishonest scheme.

Defendants argue two grounds for imputing QHL's misconduct to the Funds.

One, QHL's acts should be imputed to the Funds under principles of corporation and

agency law that impute wrongful conduct of a corporate officer to a corporation that is

wholly-controlled by that officer.  Two, the Funds admitted in their Bond Action against Lloyd's that John Gaiser and other QHL employees were employees of the Funds when they committed their wrongful and fraudulent acts, so that  judicial estoppel bars the Funds from denying that such employees acted for the Funds.

Under either of these imputation theories, QHL's misconduct must be directly related to Defendants' alleged wrongdoing at issue in this proceeding, and Defendants argue that it is.

Opposition

Plaintiffs' opposition to the MSJ initially argues their underlying case for breach of fiduciary duty by Defendants, which is not relevant to this MSJ.

The Funds next argue that QHL's misconduct should not be imputed to the Funds.  Applicable law will not impute corporate officer wrongdoing to a corporation if the officer was acting against the interests of the corporation, as here.  The "sole actor exception," which would impute liability notwithstanding such an adverse interest, should not be applied because QHL is not sole owner of the Funds and QHL was not the sole party with control over the Funds.  The Funds also argue imputation is inappropriate against LLCs (as opposed to corporations) or as a shield to benefit wrongdoers such as the Defendants.

The Funds argue that their "admissions" in the Bond Action that QHL employees were employees of the Funds was in the limited context of their lawsuit against Lloyd's and should not be used to invoke judicial estoppel.

Reply

Defendants argue that any conflict of interest on the part of Andrews Kurth, as well as the fact that the Funds are LLCs and not corporations, are irrelevant to this MSJ.

They reassert that *in pari delicto* should be applied to this situation where wrongdoer Gaiser controlled the Funds through QHL and cite a "phalanx" of cases for this proposition. Defendants argue that the adverse interest exception should not apply because it requires the agent to "totally abandon" or be "entirely adverse" to the principal's interest. Furthermore, Plaintiff's have not presented admissible evidence of any such "adverse interest" and to the extent the money went to QHL, it benefited the Funds by providing them with management.

Finally, Defendants argue that Plaintiffs cannot admit that QHL employees are employees of the Funds for one purpose in the Bond Action, but not another in this proceeding.

## **Legal Analysis**

The central issue in this MSJ is whether misconduct of QHL and its directors, officers and employees can be imputed to the Funds where the Funds had no employees, but, pursuant to their Operating Agreements, were managed by QHL, as the sole manager.

Corporation/Agency Law

California follows the well-established principle that the acts and knowledge of an officer/agent can be attributed to a corporation/principal. Imputation may be appropriate even though the Funds are LLCs rather than corporations and QHL is a manager rather

than the officer. Courts do not differentiate LLCs from more traditional corporations in this context.  *See, e.g.,*  Elder v. Greer (In re Sand Hill Capital Partners III, LLC), 2010 Bankr. LEXIS 3785, 6 (Bankr. N.D. Cal. Oct. 22, 2010); 546-552 W. 146th St. LLC v. Arfa, 863 N.Y.S.2d 412, 415 (N.Y. App. Div. 1st Dep't 2008).  Furthermore, imputation of officer acts to the corporation is simply an application of more general agency law.

This attribution or imputation rule is subject to the "adverse interest" exception, which is in turn subject to the "sole actor" exception:

> California courts have recognized a limited exception to the rule that the acts of an officer acting adversely to a company will not be attributed to it. In Peregrine, the court imputed the fraudulent conduct of an officer and sole-shareholder to the corporation in spite of the fact that his actions were adverse to it. 133 Cal. App. 4th at 679. The court reasoned that because the perpetrator of the fraud "was also the owner and sole person in control of [the corporation], his fraud is properly imputed to [the corporation]." Id.  Courts have declined to impute this exception, however, where it has not been established that all relevant decision makers for the corporation were engaged in the fraud. See Casey v. U.S. Bank Nat'l Ass'n, 127 Cal. App. 4th 1138, 1143, 26 Cal. Rptr. 3d 401 (Cal. Ct. App. 2005). Thus, finding that a corporation is barred from recovery on the basis of unclean hands is appropriate at the summary judgment stage only if the undisputed evidence meets the standard set forth in Peregrine, namely, that those who perpetrated the fraud solely control the corporation.

McHale v. Silicon Valley Law Group, 2011 U.S. Dist. LEXIS 151680, 17-18 (N.D. Cal. Dec. 14, 2011); *see also* Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP, 133 Cal. App. 4th 658, 679-680 (Cal. Ct. App. 1st Dist. 2005); *see generally*

Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., 267 F.3d 340, 358-359

(3d Cir. 2001) (under Pennsylvania law);  USACM Liquidating Trust v. Deloitte &

Touche, LLP, 764 F. Supp. 2d 1210, 1222 (D. Nev. 2011)(under Nevada law).

While New York courts have required that the agent has "totally abandoned" the

principal's interests and other courts have required "total" or "complete" adversity for the

"adverse interest" exception to apply (see numerous authorities cited by Defendants in

Reply at 9), California courts and the Ninth Circuit do not appear to require this

heightened standard of self-dealing.  See, e.g., O'Melveny, 969 F.2d at 750 ("there can

be no attribution, and therefore no estoppel, when the insiders, rather than the

corporation, benefit from the wrongdoing"); McHale, 2011 U.S. Dist. LEXIS 151680 at

17 ("officer is engaged in an activity that is adverse to the interest of the corporation").[2]

Thus, Plaintiffs' need establish only that QHL acted "adversely" to the Funds.[3]

Defendants' argument that there is no evidence that QHL acted adversely to the

Funds flies in the face of facts that Defendants rely on to initially establish QHL

wrongdoing that should be imputed to the Funds.    Defendants rely on this statement

from the complaint:  "It is abundantly clear from the Proof of Loss that John Gaiser, via

the vehicle of his alter ego, QHL, recklessly and wantonly engaged in activities that

directly caused the Funds, and, indirectly, their respective members, a financial loss of

at least 58,000,000 [sic] via the financial collapse of the Funds."  Defendants' Statement

of Uncontroverted Facts # 5..  They attempt to bridge this inconsistency by styling the

---

[2] Defendants attempt to show that California does have such a heightened standard by citing to (1) a footnote in a 1975 Ninth Circuit decision stating that fraud or stealing is required, based only on the Restatement of Agency, Funk v. Tifft, 515 F.2d 23, 26 n.4, and (2) a 1936 decision holding that an officer might in fact still be acting for a corporation (rather than adversely to it) even if the officer does get some personal benefit from the transaction. West American Finance Co. v. Pacific Indem. Co., 17 Cal. App. 2d 225 (Cal. App. 1936).  These citations are unpersuasive in the face of the more straightforward and recent authorities above.
[3] In any event, Gaiser and QHL's behavior in the Transactions may well meet the heightened standard of total abandonment or adversity required in other jurisdictions.

uncontroverted fact as the admission by Plaintiffs rather than the underlying fact itself. (To my mind, this effort skirts more uncomfortably close to inconsistent facts impinging on judicial integrity than the "judicial estoppel" concerns Defendants raise over the Lloyds' litigation.)  Logic ultimately defeats this attempt to have it both ways. Defendants must show wrongful behavior by QHL that can be imputed to the Funds for the Funds to be *in pari delicto*, but this same wrongful behavior depleted Funds' assets for the benefit of QHL and thus triggers the "adverse interest" exception to imputation. Without this wrongful behavior, there is no adverse interest exception, but there is also no wrongful conduct to impute to the Funds in the first place.

While Plaintiff's evidence that QHL benefitted from the Transactions at the expense of the Funds is not strong, it is sufficient to raise a triable issue of fact that QHL acted adversely to the interests of the Funds, so QHL's misconduct should not be imputed to the Funds (unless the sole actor exception to the adverse interest exception applies.)[4]

The fact that QHL is not the sole shareholder in the Funds does not necessarily prevent application of the "sole actor" exception.  The weight of authority applies the exception if the agent/officer was either the sole shareholder *or* the sole manager of the corporation.  *See, e.g.,* Lafferty, 267 F.3d 359-60 (sole ownership *or*

---

[4] This evidence of self dealing by QHL undermines Plaintiffs' argument that the money flowing to QHL did provide some benefit to the Funds by ensuring QHL could continue to manage the Funds.  If QHL was benefitting itself at the Funds' expense, the Funds would have been better served by QHL's failure and the retention of an honest manager.  The Operating Agreements provide for the payment of fees to the manager, so the Funds were already paying for the "benefit" of QHL's management.  Operating Agreements ¶5.7.  In any event, the Ninth Circuit has held this type of incidental benefit irrelevant:

[E]ven if the corporation were to somehow benefit from the wrongdoing of insiders, the insiders' conduct is still not attributable to the corporation if a recovery by the Plaintiff would serve the objectives of tort liability by properly compensating the victims of the wrongdoing and deterring future wrongdoing.

FDIC v. O'Melveny & Myers, 969 F.2d 744, 750-51 (9th Cir. 1992) (citing numerous authorities for this proposition).  Courts have framed this issue as who is the *primary* beneficiary.  *See, e.g.,* Baena v. KPMG LLP, 453 F.3d 1 (1st Cir. 2006); FDIC v. Ernst & Young, 967 F.2d 166, 171 (5th Cir. 1992), *reh'g denied* 1992 U.S. App. LEXIS 26696 (5th Cir. Oct. 1, 1992).

domination grounds for the exception); <u>USACM Liquidating Trust</u>, 764 F. Supp. 2d at

1220 ("The sole actor rule is most easily applied when the wrongdoer was also the

corporate principal's sole shareholder or when all the corporation's management

participated in the wrongdoing.")  California law on this point is not entirely clear.  In

<u>Peregrine</u>, which the Funds rely on for the proposition that sole ownership is required

for the exception to apply, the court's language is ambiguous:  "Because Hillmann, one

of the primary architects of the Ponzi scheme, was also the owner and sole person in

control of Peregrine, his fraud is properly imputed to Peregrine."  133 Cal. App. 4th at

679.   In this context, the phrase "owner *and* sole person in control" could mean that

both ownership and control were necessary for the "sole actor" exception to apply, but it

could also be read to mean that *either* sole ownership or control were sufficient to

trigger the exception although both happened to be present in Peregrine.[5]

In the absence of sole *ownership*, the "sole actor" exception does require sole

*control* by QHL in the misconduct at issue.  Some courts describe the sole control

requirement conversely:  the "sole actor" exception should not apply if "at least one

decision-maker could have stopped the fraud" (<u>Industrial Enters. of Am., Inc. v. Mazzuto</u>

(<u>In re Pitt Penn Holding Co</u>.), 2012 Bankr. LEXIS 5563, 20-25 (Bankr. D. Del. Nov. 30,

2012)) or "where it has not been established that all relevant decisionmakers for the

corporation were engaged in the fraud" (<u>McHale</u>, 2011 U.S. Dist. LEXIS 151680 at 18

(quoting <u>Casey v. U.S. Bank Nat. Assn.</u>, 127 Cal. App. 4th 1138, 1143 (Cal. Ct. App. 4th

Dist. 2005)).[6]   QHL did not have sole control over the Transactions.  Under the

---

[5] The Funds argue that the <u>Peregrine</u> decision imputed fraud from the individual (Hillman) to his wholly-owned corporation Peregrine (which is similar to QHL), but that it did not impute the fraud to the funding entities (which are quite similar to the Funds in this case).  That distinction is not meaningful, however, because the opinion only considered whether Peregrine's claims against Sheppard, Mullin were barred by unclean hands.
[6] Defendants argument that "every federal Court of Appeals to have considered the issue has held that the presence of people who could have stopped the fraud is immaterial to the imputation analysis" (Reply at 20) ignores

Operating Agreements, QHL needed the consent of a majority of the member shares to

enter into a transaction that presented a conflict of interest between QHL and the

Funds.  There is a material issue of fact whether these Transactions benefited QHL at

the expense of the Funds, which would be a conflict of interest, so it is a disputed issue

of fact whether QHL was the sole decisionmaker under the Operating Agreements.

(Without knowing all of the particulars of the Transactions, it is possible that they would

have required majority member consent under other provisions of ¶ 5.4 of the Operating

Agreements.)

        Defendants' "phalanx" of authority that the adverse interest exception should not

be applied to these facts is inapposite: the cases cited by Defendants usually involve

corporations used by their principals to steal from outsiders, while QHL's wrongdoing

was "theft" from the Funds themselves.  And that distinction is crucial in the case law.

Defendants point out the many similarities between this case and the facts underlying

both Peterson v. Winston & Strawn, LLP, 2012 U.S. Dist. LEXIS 147653 (N.D. Ill. Oct.

10, 2012) and Peterson v. McGladrey & Pullen, 676 F.3d 594 (7th Cir. 2012) in which

both courts imputed to several hedge funds the fraud of their corporate manager --

thereby allowing the accounting firm and law firm involved an *in pari delicto* defense

against an action by the hedge funds' bankruptcy trustee.  Notwithstanding these

similarities, the differences between this situation and the Peterson ones are ultimately

---

inconvenient facts in each cited case that distinguish it from the present circumstances.  Both Baena and Ernst & Young did not consider the "sole actor" exception, because they determined that the managers were in fact acting to "primarily" "benefit" the corporation.  453 F.3d at 8; 967 F.2d at 171.  (Baena did however reject the 9th Circuit's analysis in O'Melveny, discussed below.)  In Breeden v. Kirkpatrick & Lockhart LLP (In re Bennett Funding Group, Inc.), 336 F.3d 94 (2d Cir. 2003), the innocent independent directors were "impotent to actually do anything." 336 F.3d at 101.  The innocent directors in Official Committee of Unsecured Creditors v. Coopers & Lybrand, 322 F.3d 147 (2d Cir. 2003) likewise appear to have been without corporate authority to stop the fraud; their suggested means of preventing it would have been to implore creditors or an underwriter to intervene and rescue the corporation.  Lafferty did summarily dismiss the idea that "the possible existence of any innocent independent directors" would preclude application of the "sole actor" rule, but the wrongdoing officer was the sole shareholder of these corporations and there was no assertion that the possibly innocent directors had the authority to stop the fraud.  267 F.3d at 360.

1

2  more significant:

3      First, the Trustee contends that the pari delicto defense is inapplicable, as a

4      matter of Illinois law, because Bell was acting adversely to the interest of the

5      Funds. The district court sensibly concluded that Cenco dooms this argument.

6      Cenco predicted that Illinois would hold that fraud by corporate managers is

7      imputed to the corporation where "managers are not stealing from the

8      company—that is, from its current stockholders—but instead are turning the

9      company into an engine of theft against outsiders". Cenco, 686 F.2d at 454.

10     Thirty years have passed, and no court in Illinois has disagreed with this

11     understanding. Bell was not stealing from the Funds, whether or not he was

12     using them to snooker people who had money to invest.

13

14 McGladrey, 676 F.3d at 599.  (The Northern District of Illinois in Winston & Strawn relied

15 on the 7th Circuit's decision McGladrey to conclude that the principal was not acting

16 adversely to the hedge funds.  2012 U.S. Dist. LEXIS 147653 at 11-12.)  QHL stole from

17 the Funds, whereas the hedge funds in McGladrey and Winston & Strawn were used to

18 steal from others.  Likewise, in Cobalt Multifamily Investors I, LLC v. Arden, 857 F.

19 Supp. 2d 349 (S.D.N.Y. 2011), the securities violations by the principals benefited the

20 corporations they controlled, at the expense of outsiders.  Knauer v. Jonathon Fin.

21 Group, Inc., 348 F.3d 230 (7th Cir. 2003) also involved a Ponzi scheme in which the

22 corporations were used to bilk money from investors and the defendants' involvement in

23 the Ponzi scheme was quite minor.   Mosier v. Callister, Nebeker & McCullough, 546

24 F.3d 1271 (10th Cir. 2007)(operation of debtor as Ponzi scheme was not an "adverse

25 interest" where wrongdoing management pursued advantages *for* debtor).

26     In addition to the adverse interest exception, California courts also refuse to

27

28

impute the acts or knowledge of an officer in a situation where that officer has no power to bind the corporation.  Peregrine, 133 Cal. App. 4th at 679; McHale, 2011 US LEXIS 151680 at 17; Meyer v. Glenmoor Homes, Inc., 246 Cal. App. 2d 242, 264 (Cal. Ct. App. 1st Dist. 1966), reh'g denied, 246 Cal. App. 2d 242 (Cal Ct. App. 1st Dist. 1966). QHL's lack of authority under the Operating Agreements to bind the Funds to the Transactions also raises this exception to imputation..

Finally, the Funds argue that the Defendants should not be able to shield themselves from liability using this imputation theory in the face of their own wrongdoing.  In a remarkably similar set of circumstances, the Ninth Circuit stated:

Furthermore, we note that O'Melveny cannot invoke an estoppel defense unless it is innocent itself. See, e.g., Myers v. Moody, 693 F.2d 1196, 1208 (5th Cir. 1982) ("A party may not invoke an estoppel for the purpose of shielding himself from the results of his own fraud, dereliction of duty, or other inequitable conduct."), cert. denied, 464 U.S. 920, 78 L. Ed. 2d 264 , 104 S. Ct. 287 (1983). We conclude that ADSB has a corporate identity distinct from that of its wrongdoing officers.

FDIC v. O'Melveny & Myers, 969 F.2d 744, 751 (9th Cir. 1992).  Thus, the court ruled that O'Melveny could not attribute fraud committed by a bank's sole shareholders to the bank itself and thereby use an "unclean hands" defense to bar the bank's receiver's professional negligence action against O'Melveny.  The precedential weight of this opinion is unclear, however.  The Supreme Court reversed and remanded with instructions to determine the issue under state rather than federal law.  O'Melveny & Myers v. FDIC, 129 L. Ed. 2d 67, 114 S. Ct. 2048, 2053 (1994).  On remand, the Ninth Circuit (rather testily) maintained that their earlier opinion had been on the basis of state

law.  FDIC v. O'Melveny & Myers, 61 F.3d 17 (9th Cir. 1995).  This subsequent decision

states "we reach the same conclusion as we did the last time."  61 F.3d at 19.   If this

means that the earlier ruling stands, Defendants cannot use an equitable doctrine of *in

pari delicto* to shield themselves from the consequences of any of their "dereliction of

duty, or inequitable conduct."  However, this second Ninth Circuit decision could be read

as holding only that an equitable defense like unclean hands cannot be asserted

against "a trustee, receiver or similar innocent entity that steps into the party's shoes

pursuant to court order or operation of law."  Id.   The Plaintiffs, as debtors-in-

possession, at least arguably fall within the protection of this more narrow interpretation

of the subsequent O'Melveny ruling.

This court does not need to determine whether O'Melveny offers the Funds an

additional defense against *in pari delicto*.  It is a matter of disputed fact whether QHL

had the sole authority, or in fact any authority, to enter into the Transactions.

Accordingly, both the "adverse interest" and "no authority to act" exceptions prevent

imputation of QHL's wrongful actions in the Transactions to the Funds for the purposes

of this summary judgment motion.

Judicial Estoppel

Judicial estoppel "prohibit[s] p[arties from deliberately changing positions

according to the exigencies of the moment" and so "where a party assumes a certain

legal position in a legal proceeding, and succeeds in maintaining that position, he may

not thereafter, simply because his interests have changed assume a contrary position."

New Hampshire v. Maine, 532 U.S. 742, 749-50 (2001).  It has been applied not only to

where the party has won the previous action, but also to where the party obtained a

1  favorable settlement.  Risetto v. Plumbers and Steamfitters Local 343, 94 F.3d 597,

2  604-06 (9th Cir. 1996).   [REDACTED]

3      The Supreme Court has provided the following guidelines for the decision to

4  invoke judicial estoppel:

5

6          Although we have not had occasion to discuss the doctrine elaborately,

7      other courts have uniformly recognized that its purpose is "to protect the integrity

8      of the judicial process," by "prohibiting parties from deliberately changing

9      positions according to the exigencies of the moment." Because the rule is

10     intended to prevent "improper use of judicial machinery," judicial estoppel "is an

11     equitable doctrine invoked by a court at its discretion."  Courts have observed

12     that "the circumstances under which judicial estoppel may appropriately be

13     invoked are probably not reducible to any general formulation of principle."

14     Nevertheless, several factors typically inform the decision whether to apply the

15     doctrine in a particular case: First, a party's later position must be "clearly

16     inconsistent" with its earlier position. Second, courts regularly inquire whether the

17     party has succeeded in persuading a court to accept that party's earlier position,

18     so that judicial acceptance of an inconsistent position in a later proceeding would

19     create "the perception that either the first or the second court was misled,"

20     Absent success in a prior proceeding, a party's later inconsistent position

21     introduces no "risk of inconsistent court determinations," and thus poses little

22     threat to judicial integrity. A third consideration is whether the party seeking to

23     assert an inconsistent position would derive an unfair advantage or impose an

24     unfair detriment on the opposing party if not estopped.

25

26  New Hampshire v. Maine, 532 U.S. at 749-751 (citations omitted).

27

28

Defendants cite the following "admissions" by the Funds in the context of their attempts to recover from Lloyd's.  (Italicized language was left out of quotations in Defendants' Memorandum of Points and Authorities.  The Court notes that some of these omissions change the meaning of the quoted language in a manner favorable to Defendants.)

> [E]ach of the acts of the officers and employees of Quality Homes Loans are deemed to be acts of employees of the Funds *for purposes of coverage under the fidelity bond*.

10/23/09 Letter by Jay Robinson, counsel to the Funds, sending a Proof of Loss to Scott Schmoo-kler, counsel to Lloyd's (Defendants' Exhibit X) at 7.

> "Employees" as defined by the subject insurance policies and California case law, have engaged in certain dishonest and fraudulent acts which have resulted in losses to THE FUNDS *during the subject policy periods, well in excess of the combined limits of the primary and excess bond policies*.

Complaint dated 4/15/10 (Defendants' Exhibit F) ¶ 9.

> Plaintiff's FAC alleges *that under Coverage (A), "The primary bond insurance, and by reference, the excess bond insurance, provided by their terms that as to 'fidelity' matters, the Defendants under such policies would indemnify the insureds, including THE FUNDS, for among other damages . . .* Loss resulting solely and directly from one or more dishonest or fraudulent acts by an employee . . ." and that such employees "have engaged in certain dishonest and fraudulent acts which have resulted in losses to THE FUNDS *during the subject policy periods, well in excess of the combined limits of the Primary and Excess Bond Policies*.

Plaintiffs'' (the Funds) Opposition to Defendants' (Lloyd's) Motion to Strike in the Bond

Action (Defendants' Exhibit H) at 1:20-29.  This sentence is simply quoting the

Complaint, which Defendants have already quoted.

> *Plaintiff admits that, up to the filing of its bankruptcy, it did not have any*
>
> *employees but*
>
> Plaintiff asserts that under California law, the employees of QHL were deemed to
>
> be employees of the Plaintiff for the limited purpose of triggering coverage under
>
> the subject Bond Policies under insuring Agreement "A."

Plaintiffs' (the Funds) Responses to Requests for Admissions (Defendants' Exhibits L &

N) at 15.

> *[t]he Plaintiff believes that the claims submitted by Plaintiff to Defendants are*
>
> *covered under insuring Agreement A of the bonds in that the* losses were caused
>
> by dishonest and fraudulent acts by persons deemed to be employees of  the
>
> funds under California case law . . . ."

Plaintiffs' (the Funds) Responses to Form Interrogatories (Defendants' Exhibits O & P)

at 10.

> given that the Funds had no actual employees, the employees of QHL are
>
> deemed to be employees of the Funds for purposes of bond coverage under
>
> California law *(see Research Equity Fund v. INA, 602 Fed.2d 200)).*

1/23/10 Letter by Jay Robinson, counsel to the Funds, to Scott Schmookler, Esq.

(Defendants' Exhibit Z) at 2.

Invocation of judicial estoppel is in my discretion and, after considering the

guidelines set by the Supreme Court in Maine v. New Hampshire, I will not invoke it

here.  As a group, these "admissions" are generally limited by the use of "deemed" or

"for the purposes of bond coverage," or the like.   The Funds quite clearly limited their

assertion that employees of QHL were employees of the Funds to the context of

coverage under the Lloyd's bonds.  Claiming QHL employees were employees of the

Funds for the limited purpose of insurance coverage is "not inconsistent" with arguing

that they were not employees of the Funds for other purposes; neither the Superior

Court nor this court would "appear to be misled."  The Funds' argument in the Bond

Action makes sense:  unless QHL's employees were deemed to be employees of the

Funds, the loyalty bond issued in favor of the Funds was meaningless.  If in fact Lloyd's

had been paid to issue a bond covering malfeasance by "employees" of the Funds, and

the Defendants in this proceeding did commit wrongful actions that injured the Funds,

the Funds' recovery from both Lloyd's and Defendants using a different definition of

employee in different contexts does not confer an unfair advantage on the Funds.  In

sum, I do not need to dismiss this suit to preserve the integrity of the courts.

Motion denied.

###

Date: March 6, 2013

_____
Geraldine Mund
United States Bankruptcy Judge

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Evidentiary Objections**

Plaintiffs' Objections to Evidence Offered by Defendants

Plaintiff objections to Defendants' statements of uncontroverted *fact* (whether as irrelevant, immaterial, a misstatement of the evidence, lacking foundation or otherwise) are not objections to *evidence* and will not be considered.

Although Plaintiff has not cited the Federal Rules of Evidence underlying its objections and objections without such citations may be deemed waived under LBR 9013-1(i)(2), I will consider the remaining objections:

-        Objections to Defendants' Exhibits F-H – overruled

-        Objections to Defendants' Exhibits J-T – overruled

-        Objections to Defendants' Exhibits U, X-BB - overruled

-        Objection to Defendants' Exhibit CC – sustained to the extent that witness lacks personal knowledge or states an opinion not within FRE 701

Defendants' Evidentiary Objections to Declaration of Randy Miller

Sustained to the extent witness lacks personal knowledge

Plaintiffs' Evidentiary Objection to Excerpts from Brief from Peregrine in support of Reply

Overruled

# NOTICE OF ENTERED ORDER AND SERVICE LIST

Notice is given by the court that a judgment or order entitled (*specify*): __ **REDACTED
MEMORANDUM OF OPINION REGARDING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT [DOCKET NUMBER 62]**
_____
was entered on the date indicated as "Entered" on the first page of this judgment or order and will be
served in the manner stated below:

**1.   SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)** – Pursuant to controlling
General Orders and LBRs, the foregoing document was served on the following persons by the court via
NEF and hyperlink to the judgment or order. As of (*date*)_____, the following persons are
currently on the Electronic Mail Notice List for this bankruptcy case or adversary proceeding to receive
NEF transmission at the email addresses stated below.

Craig Millet:  cmillet@gibsondunn.com
Samuel Newman: snewman@gibsondunn.com
Jay H. Robinson:  jayrobinson@mrfflaw.net
Robyn Sokol:  ecf@ebg-law.com, rsokol@ebg-law.com
Corey Weber:  ecf@ebg-law.com, cweber@ebg-law.com
United States Trustee:  ustpregion16.wh.ecf@usdoj.gov

☐  Service information continued on attached page

**2.   SERVED BY THE COURT VIA UNITED STATES MAIL:** A copy of this notice and a true copy of this
judgment or order was sent by United States mail, first class, postage prepaid, to the following persons
and/or entities at the addresses indicated below:

Dennis P. DeFranzo
Jay H. Robinson
Marrone, Robinson, Frederick & Foster
111 North First St., Suite 300
Burbank, CA 91502-1851

Kevin Rosen
Craig Millet
Joshua Jessen
Gibson, Dunn & Crutcher LLP
333 S. Grand Avenue
Los Angeles, CA 90071-3197

☐  Service information continued on attached page

**3.   TO BE SERVED BY THE LODGING PARTY**: Within 72 hours after receipt of a copy of this judgment
or order which bears an "Entered" stamp, the party lodging the judgment or order will serve a complete
copy bearing an "Entered" stamp by United States mail, overnight mail, facsimile transmission or email
and file a proof of service of the entered order on the following persons and/or entities at the addresses,
facsimile transmission numbers, and/or email addresses stated below:

☐  Service information continued on attached page

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                          **F 9021-1.1.NOTICE.ENTERED.ORDER**